**Michael Wesley SEARCY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 06–06–00053–CR.**

Court of Appeals of Texas, Texarkana.

Submitted June 21, 2007.

Decided Aug. 15, 2007.

Discretionary Review Refused Nov. 14, 2007.

James P. Finstrom, Jefferson, for appellant.

William K. Gleason, Dist. Atty., Jefferson, for appellee.

Before MORRISS, C.J., CARTER and MOSELEY, JJ.

## OPINION

Opinion by Justice CARTER.

A Marion County jury found Michael Wesley Searcy guilty of the murder of Kenneth Foster and assessed punishment at sixty years' imprisonment. On appeal, Searcy raises three points of error. We affirm.

## I. FACTUAL BACKGROUND

An ongoing feud[1] between Searcy and Foster culminated in a confrontation Octo-

1. There is evidence that Searcy owed Foster money after Searcy destroyed the shotgun Foster had pulled on Searcy seven months before this incident and that Anna Whitaker

ber 11, 2005. In Smithland, there is a tree between a local convenience store and a trailer park under which friends and neighbors gather and play dominoes. Earlier in the day, Foster had been playing dominoes with friends under that tree. Searcy, who lived in a trailer up the road, had come down to this area to talk with one of the residents about doing some bush-hogging work for Searcy, then Searcy returned to his house and continued to do yard work. Hot and thirsty from the work, he returned to the convenience store and social hub, the Pic–N–Pay, to buy some beer. This time he brought a gun.

Although Searcy claims to have been trying to keep a low profile and avoid Foster, Searcy found himself in the trailer park and in a verbal confrontation with Foster during this second trip to the store and gathering-spot. Witnesses testified that Searcy drew at least one line in the dirt and, as the apparently weaponless Foster approached that line, Searcy pulled a gun and began to fire at Foster. Foster ran, and Searcy chased after him and caught up to Foster, firing one last shot to the back of Foster's head.

Searcy lingered only long enough to empty the spent casings and say something to the effect that now he had a reason to go to jail. Searcy then stated, "F* * * all y'all," and fled the scene. Foster sustained three gunshot wounds, all consistent with eyewitness accounts that he was running away from Searcy. Although Searcy admitted shooting Foster, he would later testify at trial that Foster had struck him with one hand and wielded a knife in the other; none of the several eyewitnesses testified so, and no one recovered a knife from the scene.

## II. REFUSAL OF REQUESTED CHARGE ON NECESSITY

▬▬ The trial court refused to include the defense of necessity in the jury charge, but did charge the jury on self-defense using deadly force.[2] On appeal, Searcy complains that the trial court erred by not including a charge on necessity in addition to self-defense: "Appellant further urges that the [trial] court's instruction to the jury on self-defense does not preclude a charge on the law of necessity." Under the law of self-defense applicable here, he is incorrect.[3]

Under Section 9.22 of the Texas Penal Code, conduct is justified, under necessity, if:

(1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;

(2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and

had lived with Searcy, then dated Foster, then returned to live with Searcy. There is also evidence that Searcy owed Foster for drugs.

**2.** When we review a jury charge for error, we first determine whether the alleged error was preserved. If so, any harm, regardless of the degree, is sufficient to require reversal of the conviction. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1984) (op. on reh'g). Here, Searcy properly preserved error.

**3.** We recognize that, effective September 1, 2007, "[a] person who has a right to be present at the location where the deadly force is used, who has not provoked the person against whom the deadly force is used, and who is not engaged in criminal activity at the time the deadly force is used" will not be required to retreat before using deadly force. Act of March 20, 2007, 80th Leg., R.S., ch. 1, § 3(c), 2007 Tex. Sess. Law Serv. 1, 2 (to be codified at Tex. Penal Code § 9.32).

(3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

TEX. PENAL CODE ANN. § 9.22 (Vernon 2003). In determining whether a trial court should include both necessity and self-defense in its charge to the jury, Texas courts have concentrated on subsection (3) as it relates to the justification of self-defense using deadly force. Specifically, courts have looked at Section 9.22(3) and the duty to retreat found in Section 9.32(a)(2). TEX. PENAL CODE ANN. §§ 9.22(3), 9.32(a)(2) (Vernon 2003).

The Dallas court specifically addressed the issue of including both justifications in *Butler v. State*, 663 S.W.2d 492, 496 (Tex. App.-Dallas 1983), *aff'd on other grounds*, 736 S.W.2d 668 (Tex.Crim.App.1987). The *Butler* court focused on the legislative purpose of the duty to retreat before using deadly force found in Section 9.32(a)(2). *Id.* Since it plainly appeared that the Legislature imposed this duty before one used deadly force, necessity was excluded as a possible justification under Section 9.22(3). *See id.* As the *Butler* court explains: "Any other result would circumvent the 'retreat' requirement of Article 9.32 and thus thwart the legislative purpose to impose a higher standard where the use of deadly force is sought to be justified." *Id.* In other words, when self-defense using deadly force becomes the "immediately necessary" conduct urged under Section 9.22(3), necessity is excluded as a justification.[4]

The Fort Worth court treated the issue slightly differently in *Banks v. State*, 955 S.W.2d 116 (Tex.App.-Fort Worth 1997, no pet.). Reviewing a murder conviction in which a defendant shot his girlfriend in the head as the couple sat in a car, the Fort Worth court concluded that the trial court did not err by refusing to instruct the jury on self-defense and defense of a third person when the trial court instructed the jury on necessity. *See id.* at 118–19. The defendant had maintained that he shot his girlfriend accidentally as he shot at a stranger who had approached the passenger window. *Id.* at 117. *Banks* suggests that, in cases where both justifications are raised, inclusion of one precludes inclusion of the other. *See id.* at 119. That is, if the jury is charged on necessity, self-defense is inapplicable, even though the defendant would necessarily be held to a lesser standard in proving necessity as a justification:

> Thus, when self defense is submitted in the jury charge, the defense of necessity cannot be submitted. Use of the necessity defense together with self-defense would thwart the legislative purpose to impose a higher standard and circumvent the "retreat" requirement of section 9.32 where the use of deadly force is sought to be justified. *Id.* In the present case, the court, having submitted the defensive charge of necessity, was precluded from submitting a charge on self-defense. The benefit received by appellant was that he was not bound by the retreat requirement.

*Id.* So, the *Banks* opinion treated this issue as an either/or situation, in contrast to the *Butler* approach that seemingly excludes necessity as a justification when deadly force is at issue.

This Court has recognized the *Butler* rule in a slightly different context. *Gonzales v. State*, 2 S.W.3d 600, 606 (Tex.App.-Texarkana 1999, pet. ref'd). In concluding

---

4. The Dallas court reaffirmed its position: "On authority of *Butler*, we hold that the court did not err in failing to instruct on necessity." *Epley v. State*, 704 S.W.2d 502, 506 (Tex.App.-Dallas 1986, pet. ref'd); *see also Hermosillo v. State*, 903 S.W.2d 60, 68 (Tex.App.-Fort Worth 1995, pet. ref'd).

that an appellant was not harmed by the trial court's refusal to permit defense counsel to question the jury panel on the defense of necessity, this Court wrote:

> There is authority holding that in murder cases in which self-defense is raised, the defense of necessity is inapplicable. *Butler* ... stated that the law of necessity and the law of self-defense do not overlap, holding that [Section] 9.22 was rendered inapplicable when self-defense is the "immediately necessary" conduct. *See Banks v. State,* 955 S.W.2d 116, 118–19 (Tex.App.-Fort Worth 1997, no pet.).

*Id.* Searcy relies on another opinion from this Court in which we held that a defendant convicted of murder was entitled to a defense on necessity. *See Hubbard v. State,* 133 S.W.3d 797, 803 (Tex.App.-Texarkana 2004, pet. ref'd). Hubbard, an inmate, got into a physical altercation with his cell mate, Townsel, after Hubbard awoke to Townsel on top of him and attempting to rape him. *Id.* at 798. Ultimately, Townsel died from an infection that developed from the broken sternum and broken ribs he suffered in the fight. *Id.* Hubbard was denied a jury instruction on necessity and was convicted of murder. *Id.* We concluded that, on those particular facts, Hubbard was entitled to an instruction on necessity. *Id.* at 803.

It is important to note that Hubbard did not request a necessity instruction *in addition to* a self-defense instruction, distinguishing *Hubbard* from the instant case. Further, although Townsel did ultimately die from an infection caused by injuries sustained in the fight, it does not appear that Hubbard faced any deadly force from Townsel's actions and, therefore, Hubbard was not entitled to use deadly force in his defense. Consequently, the duty to retreat was not at issue. So, *Hubbard* can be distinguished from the instant case as can another case on which Searcy relies, *Withers v. State,* 994 S.W.2d 742 (Tex. App.-Corpus Christi 1999, pet. ref'd). The *Withers* court held that the defendant was entitled to an instruction on the issue of necessity as well as instructions on self-defense and defense of a third person. *Id.* at 746. However, deadly force and the retreat duty were not at issue in *Withers* either, therefore making that case distinguishable from the case at bar.

Here, the trial court instructed the jury on self-defense using deadly force, which included a duty to retreat. Searcy wanted both self-defense *and* necessity. We conclude that the inclusion of the justification of necessity, on facts such as these which clearly implicate the application of self-defense using deadly force, would undermine the Legislature's purpose in imposing the duty to retreat. We overrule Searcy's point of error.

## III. ADMISSION OF STATEMENT IN POST–WARNING PORTION OF VIDEOTAPE

### A. The Videotape and the Deputy's Statement

When law enforcement learned the identity and location of Searcy, Deputies Stephen Thomas and Jerry Bruce drove to Searcy's residence. Searcy voluntarily left his house to speak with the deputies. This interaction was recorded by the in-car video recorder.[5] Searcy was handcuffed out of safety concerns, and Deputy Thomas began asking him identifying information and then started asking about the location of the gun. After Searcy had already

---

**5.** At the very beginning of the recording, there was no audio. After the microphone began recording, the videotape shows that Searcy's answers were often nonresponsive to the deputies' questions regarding the location of the gun and that Searcy's answers went instead to the details of the argument between him and Foster.

made several statements, Deputy Bruce brought Searcy to the vehicle and began reading Searcy his rights. Just as Deputy Bruce was beginning to give those warnings, a dispatch came in to the deputies reminding them to give those warnings. Part of that dispatch call occurred while Bruce was giving Searcy warnings and makes intermittent portions of the warnings inaudible.

At trial, Searcy objected to the admission of any of the recording based on violations of Article 38.22. He argued that the first portion of the recording contained oral statements in response to custodial interrogation and did not comply with the warning requirement of Article 38.22. *See* TEX.CODE CRIM. PROC. ANN. art. 38.22, § 3 (Vernon 2005). The trial court agreed as to the prewarning portion of the videotape, but found the warnings administered by Bruce after Searcy was taken to the car to be the fully effective equivalent of the warning required by Article 38.22 for the admission of a recorded oral statement given in response to custodial interrogation. *See* TEX.CODE CRIM. PROC. ANN. art. 38.22, §§ 2(a), 3(a)(2) (Vernon 2005). The trial court also found that, although Searcy was not visible when asked if he understood his rights, other, verbal cues clearly indicated that Searcy waived his rights. The trial court admitted the portion of the recording following the warnings.

Later in the proceeding when the State offered portions of the transcript of the pre-warning statement, the trial court agreed with the State that testimony regarding certain remarks contained in the pre-warning portion of the videotape had been elicited without objection. Indeed, defense counsel even elicited testimony regarding the statements Searcy made to the deputies when they first arrived at the residence. A partial transcript of the pre-warning portion of the recording was ad-

mitted by agreement. This transcript included Searcy's initial account of the confrontation that included a statement to the effect that he took a gun away from Foster.

On appeal, Searcy contends the trial court erroneously admitted the post-warning portion of the recording that refers to Searcy's earlier, inconsistent account on the pre-warning portion of the videotape. He also argues that this portion of the recording was inadmissible because of the deputies' failure to strictly comply with the requirements of Article 38.22.

### B. Deputy's Statement as Reference to Subsequently Admitted Evidence

It is important to note that the pre-warning portion of the videotape contains the majority of Searcy's direct statements of the event. We reiterate that defense counsel agreed to the admission of a partial transcript of the pre-warning portion that includes Searcy's initial versions of the confrontation with Foster. We also point out that, in some respects, the applicability of Article 38.22 is tenuous here. That is, Searcy specifically complains of Thomas' statement in the post-warning portion that refers to Searcy's earlier statements. Since it is Thomas' statement at issue rather than Searcy's own statement and since the deputy's statement refers to evidence later admitted, we question whether Article 38.22 is the most fitting analysis.

We look at Thomas' statement that Searcy failed to mention a knife in his earlier accounts as one that refers to evidence subsequently admitted by agreement. Evidence prematurely admitted in error may become admissible or its admission rendered harmless when other evidence is subsequently admitted. *See James v. State*, 102 S.W.3d 162, 175 (Tex. App.-Fort Worth 2003, pet. ref'd). So, even

assuming that Thomas' recorded statement somehow violated Article 38.22 by referring to Searcy's pre-warning version of events, any error was rendered harmless when that pre-warning version of events was admitted by agreement. The jury heard Searcy's account that Foster had a knife and then later heard Searcy's various other accounts of the confrontation that included the assertions that Foster "jumped him" and that Searcy took the gun away from Foster. Those prior versions made no mention of a knife. The jury, then, was able to observe, as did Thomas, that Searcy did not initially mention a knife in his depiction of the shooting. We conclude that Thomas' statement on the videotape is one that refers to evidence subsequently admitted by agreement and, therefore, there is no harmful error associated with admission of the statement.

### C. Videotape as Impeachment

The focus of Searcy's argument is that Thomas' statement on the recording refers to Searcy's statements made before any

Article 38.22 warnings were given and that, in doing so, puts before the jury what Article 38.22 prohibits and what the trial court ruled as inadmissible: Searcy's pre-warning statements.

We can uphold the trial court's ruling on the admitted portion of the videotape containing Thomas' statement if correct under any theory applicable to the case. *Sauceda v. State*, 129 S.W.3d 116, 120 (Tex.Crim. App.2004). With that in mind, we also note that, in addition to the several warnings Article 38.22 requires,[6] it also provides for admission of oral statements that do not necessarily comply with those requirements for, among other purposes, impeachment of a testifying defendant:

> Nothing in this article precludes the admission of a statement made by the accused in open court at his trial, before a grand jury, or at an examining trial in compliance with Articles 16.03 and 16.04 of this code, or of a statement that is the res gestae of the arrest or of the offense, or of a statement that does not stem

---

**6.** Article 38.22 requires the following warnings to be made:

(1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

(2) any statement he makes may be used as evidence against him in court;

(3) he has the right to have a lawyer present to advise him prior to and during any questioning;

(4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5) he has the right to terminate the interview at any time.

TEX.CODE CRIM. PROC. ANN. art. 38.22, § 2(a). Article 38.22 also requires that the "the accused knowingly, intelligently, and voluntarily waive[ ] any rights set out in the warning." TEX.CODE CRIM. PROC. ANN. art. 38.22, § 3(a)(2). In the videotape, Deputy Bruce can be heard issuing the following warnings interrupted by the dispatch call to Deputy Thomas:

You have the right to have . . . prior to any questioning

If you are unable to employ a lawyer, you have the right to have one appointed . . . prior to and during any questioning

You have the right to remain silent and not make any statement at all

. . . will be used against you. . . .

You have the right to terminate any interview at any time.

When Deputy Bruce asked if Searcy understood this, Searcy softly replied in the affirmative. The deputy responded "O.K.," and then Searcy nearly immediately continued with a disjointed account of how Foster swung at him with one hand and added that Foster had a knife in the other hand. The trial court found the warnings to be a fully effective equivalent as permitted by Article 38.22, Section 3(e)(2) of the Texas Code of Criminal Procedure. *See* TEX.CODE CRIM. PROC. ANN. art. 38.22, § 3(e)(2); *Buckley v. State*, 46 S.W.3d 333, 337 (Tex.App.-Texarkana 2001, pet. dism'd, untimely filed).

from custodial interrogation, or of a voluntary statement, whether or not the result of custodial interrogation, that has a bearing upon the credibility of the accused as a witness, or of any other statement that may be admissible under law.

TEX.CODE CRIM. PROC. ANN. art. 38.22, § 5 (Vernon 2005).

■ In the post-warning portion of the videotape, Searcy added that Foster had a knife in one hand, a statement to which Searcy testified several times. That said, under Article 38.22, the State could use the videotape, regardless of the timing of the warnings, to impeach Searcy on this issue. Put another way, regardless of the agreement to admit the transcript of the relevant portion of the pre-warning portion of the recording, Searcy's recorded statements were likely admissible as impeachment. And the deputy's statement that Searcy had not earlier mentioned a knife would be the very point that the State would make as it pointed out the many ways in which the recorded statements were inconsistent with Searcy's trial testimony that Foster wielded a knife. Again, the jury would be able to note the inconsistencies, making the deputy's observation an obvious one and rendering harmless any error associated with the deputy's statement. We overrule Searcy's point of error.

## IV. JURY ARGUMENT: COMMENT ON FAILURE TO TESTIFY

### A. State's Argument and Defense Counsel's Objection

Searcy testified at the guilt/innocence phase of trial, but did not testify at the punishment phase of trial. During its jury argument at the punishment phase, the State argued on the topic of remorse:

[The State]: And his parting remark to the dead Mr. Foster was, "They already hauled that M.F. off already?" Well, I heard a lot of "F" words, but there's two words I never heard. I didn't hear it when he was testifying on direct, and I never heard it in the punishment hearing. Two simple words.

[Defense Counsel]: Your Honor, I'd object to the argument as a comment on the failure—Defendant's failure to testify at the punishment hearing.

The trial court then immediately sent the jury out of the courtroom, after which the trial court had the court reporter read back the relevant portion of the State's argument. The trial court sustained defense counsel's objection:

I'm going to sustain the objection and instruct the jury to disregard the comment. I want to clarify however. I'm making this ruling based upon only the comment that you made where "I didn't hear it in the punishment hearing." I'm not saying that I am disallowing you to go back and restate to the jury[,] if you desire[,] that you didn't hear it while he was testifying on direct and that you didn't hear it on the tape.

Defense counsel moved for a mistrial, and the trial court denied that motion. The trial court then brought the jury back into the courtroom.

### B. Trial Court's Instruction to Jury

The trial court instructed the jury as follows:

Immediately before I sent you to the jury room, there had been an objection to some argument made by [the State]. I am sustaining that objection and I am instructing the jury to totally disregard and not consider for any purpose the argument that had been made by [the State] immediately preceding the objection being made.

Defense counsel again unsuccessfully moved for a mistrial. The State continued

its argument to the jury, tailoring it to the trial court's ruling.[7] On appeal, Searcy contends that the trial court abused its discretion by denying his motion for mistrial based on the State's original argument.

## C. Applicable Law: Comment on Defendant's Failure to Testify

■ The failure of a defendant to testify on his or her own behalf in a criminal trial may not be taken as a circumstance against the defendant, and neither counsel may allude to or comment on such a refusal. TEX.CODE CRIM. PROC. ANN. art. 38.08 (Vernon 2005); *Pina v. State*, 38 S.W.3d 730, 740 (Tex.App.-Texarkana 2001, pet. ref'd). A comment on a defendant's failure to testify violates both Federal and State Constitutions and a mandatory state statute. *See Fontaine v. California*, 390 U.S. 593, 88 S.Ct. 1229, 20 L.Ed.2d 154 (1968); *Bustamante v. State*, 48 S.W.3d 761, 765 (Tex.Crim.App.2001); TEX.CODE CRIM. PROC. ANN. art. 38.08.

Recently, the Texas Court of Criminal Appeals has addressed this issue and has emphasized the position that, in this procedural posture, reviewing courts must focus their analysis on whether a trial court abused its discretion when it denied a motion for mistrial based on a prosecutor's improper jury argument. *See Archie v. State*, 221 S.W.3d 695 (Tex.Crim.App. 2007).

■ To determine whether improper jury argument warrants a mistrial and whether a trial court abused its discretion when it denied the motion for mistrial, we balance three factors:

1) severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks);

2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and

3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction).

*Id.* at 700 (citing *Ramon v. State*, 159 S.W.3d 927, 929 (Tex.Crim.App.2004); *Mosley v. State*, 983 S.W.2d 249 (Tex.Crim. App.1998)). The *Archie* court pointed out that, when the alleged improper argument occurred at the punishment phase—as it did in both *Archie* and the instant case—the third factor involves an analysis of the certainty of the punishment assessed. *Id.; Martinez v. State*, 17 S.W.3d 677, 693 (Tex. Crim.App.2000).

### 1. Severity of the misconduct

■ Initially, we observe that defense counsel objected to the argument before the State finished its argument. So, although it is likely that the jury anticipated what the two simple words of remorse were, the argument is incomplete. Further, it might also be noteworthy that the State makes the distinction between what *Searcy did not say* during his testimony and what the *jury did not hear* in punish-

---

**7.** Specifically, the State continued as follows: As I was saying, you heard a lot of "f" words and a lot of cussing and a lot of aggressive talk by Mr. Searcy on those tapes, both the video and the audio tapes. As I was also saying, you heard a lot of those words, but I never heard two words while Mr. Searcy was testifying. And I never heard those two words from any of the witnesses who testified in Mr. Searcy's case. They're very simple words. They're

words of remorse. It's "I'm sorry." And you can say that even if you killed someone that you think is trying to harm you, because taking a human life is serious. And I never heard those words.

Although there may be some concern as to the State's argument as it relates to the failure of Searcy's witnesses to testify about his remorse, Searcy made no objection to the argument as modified.

ment. *See Thomas v. State,* 638 S.W.2d 481, 482 (Tex.Crim.App.1982). Calling attention to the absence of evidence which only the defendant could produce will result in reversal only if the remark can only be construed to refer to the defendant's failure to testify and not the defense's failure to produce evidence. *See Fuentes v. State,* 991 S.W.2d 267, 275 (Tex.Crim. App.1999). When there is evidence in the record indicating a lack of remorse, a comment on the defendant's lack of remorse does not naturally and necessarily lead the jury to understand it to be a comment on the defendant's failure to testify. *See Howard v. State,* 153 S.W.3d 382, 385 (Tex. Crim.App.2004); *Caldwell v. State,* 818 S.W.2d 790, 800–01 (Tex.Crim.App.1991).

■ Here, in much the same way as the *Caldwell* court did, we look at Searcy's reluctance to help locate the gun and his several expressions of concern for his own safety immediately after the shooting.[8] The jury heard evidence from A.J. McDonald, a witness, that, shortly before Searcy fled the scene, Searcy emptied the shell casings into his hand and stated, "Now I got a reason to go to jail." Further, the jury had before it Searcy's 9–1–1 call[9] and the videotape. The record contains some evidence indicating a lack of remorse, therefore enabling the jury to interpret the State's truncated statement

as argument other than that which implicated the fact of Searcy's failure to testify at punishment. For that reason, we conclude that any misconduct, here, was minimal.

**2. Curative measures**

■ Whether a curative instruction is effective depends on the facts of each case. *Swallow v. State,* 829 S.W.2d 223, 227 (Tex.Crim.App.1992); *Hardin v. State,* 20 S.W.3d 84, 93 (Tex.App.-Texarkana 2000, pet. ref'd). The question is essentially one of balancing the magnitude of the probable effect of the question on the jury against the probable efficacy of an instruction to disregard.[10] *Hardin,* 20 S.W.3d at 93. The greater the magnitude of effect, the less likely it is that an instruction would cure the harm. *See id.; see also Dinkins v. State,* 894 S.W.2d 330, 357 (Tex.Crim. App.1995) (explaining that only in the most blatant examples will the courts apply the presumption that an instruction to disregard generally will not cure comment on failure to testify).

We first note that the trial court promptly removed the jury from the courtroom and promptly requested the court reporter read the precise language, and delivered a careful, tailored ruling on defense counsel's objection. When the jury returned, the trial court directed the jury

---

8. (Paraphrasing: I'm worried I'm going to get shot through this police car; "I sh* * you not," I was trying to get away from there), his failure to inquire as to the condition of Foster, and his observation that they must have already hauled that "m.f." off as evidence of his lack of remorse.

9. The act of calling 9–1–1 may be said to be some evidence that Searcy did feel remorse. We do not have the audiotape of that call. It should be noted, too, that Anna Whitaker Gray testified that Searcy was crying and saying that he had "f* * *ed up." So while there is evidence that Searcy did not feel

remorse, there is also evidence that could support the contrary.

10. The Waco court has evaluated the effectiveness of an instruction to disregard by weighing the following factors: "the nature of the [improper comment]; the persistence of the prosecutor; the flagrancy of the violation; the particular instruction given; the weight of the incriminating evidence; and the harm to the accused as measured by the severity of the sentence." *Roberson v. State,* 100 S.W.3d 36, 41 (Tex.App.-Waco 2002, pet. ref'd); *see Adams v. State,* 156 S.W.3d 152, 157 (Tex. App.-Beaumont 2005, no pet.).

to disregard the comment immediately preceding the objection. While it could be said that the instruction would have been more effective by specifying the argument at issue, we observe that the trial court's instruction minimized the impact of the argument by not repeating it to the jury; the trial court's repetition may have only compounded any effect of the argument and made it more difficult for the jury to disregard. We also consider that the State carefully complied with the trial court's ruling when the State continued its argument.

### 3. Certainty of punishment

The evidence showed that Searcy shot the fleeing Foster several times and contradicts Searcy's assertion of self-defense. The jury learned of Searcy's several prior convictions and past acts of violence, evidence that would support a sixty-year sentence. *See Archie,* 221 S.W.3d at 700.

 Considering the ambiguous argument, the trial court's prompt instruction, the State's compliance with the ruling, and the state of the evidence supporting the sixty-year sentence, we conclude that the trial court did not abuse its discretion by denying Searcy's motion for mistrial and overrule his final point of error.

Having overruled Searcy's points of error, we affirm the trial court's judgment.